IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | Criminal No. SAG-20-0452 |
| KEITH POYNTER, JR. | * | |

\* \* \* \* \* \* \*

## MEMORANDUM OPINION

On December 10, 2020, a grand jury returned an indictment against Keith Poynter, Jr. and others for robbery and firearms-related offenses. ECF 1. Mr. Poynter has filed a motion to suppress physical evidence seized during a search of his residence, ECF 32, and a motion to suppress statements he made during custodial interrogation, ECF 33. This Court has considered those motions, the related briefing (ECF 39, 41), and the evidence presented and arguments made by counsel at a hearing held on September 9, 2022. For the reasons that follow, Mr. Poynter's motions will be denied.

I.  **Motion to Suppress Property**

On December 20, 2019, Baltimore County Police Department detectives arrested Mr. Poynter on the basis of evidence they developed during a robbery investigation. ECF 39 at 2–3. During a custodial interview with Detective Kyle Feeley, Mr. Poynter indicated that he had been staying at 2304 Ashburton Street, Baltimore, Maryland, the address to which his Maryland Learner's Instructional Permit had been issued about one month prior. ECF 32 at 2. 2304 Ashburton Street is located in Baltimore City.

On that same date, Baltimore County officers presented a search warrant for the Ashburton address to Judge Paul J. Hanley of the Circuit Court for Baltimore County. ECF 32-1. Judge

Hanley signed the warrant and the police seized evidence from the home during the resulting search. ECF 32 at 2. Mr. Poynter's Motion challenges Judge Hanley's power to order the search because he is a judge in Baltimore County, not Baltimore City, and because he is a Circuit Court judge, not a District Court judge. ECF 32.

Article IV, Section 18 of the Maryland Constitution provides the Court of Appeals authority to adopt rules regarding the administration of the courts and the Chief Judge authority to assign a judge to sit temporarily in another court. The relevant provisions read:

> (a) The Court of Appeals from time to time shall adopt rules and regulations concerning the practice and procedure in and the administration of the appellate courts and in the other courts of this State, which shall have the force of law until rescinded, changed or modified by the Court of Appeals or otherwise by law. The power of courts other than the Court of Appeals to make rules of practice and procedure, or administrative rules, shall be subject to the rules and regulations adopted by the Court of Appeals or otherwise by law.
>
> (b) (1) The Chief Judge of the Court of Appeals shall be the administrative head of the Judicial system of the State. . . .
>
> (2) . . . the Chief Judge of the Court of Appeals may, in case of a vacancy, or of the illness, disqualification or other absence of a judge or for the purpose of relieving an accumulation of business in any court assign any judge except a judge of the Orphans' Court to sit temporarily in any court except an Orphans' Court.

Md. Const., art. IV, § 18. In accordance with that constitutional provision, the Maryland Court of Appeals has adopted Md. Rule 16-108(b), which reads:

> The Chief Judge of the Court of Appeals, by order, may assign (1) a judge of the District Court, a circuit court, or an appellate court to sit temporarily in another court other than an Orphans' Court, . . . . The order shall specify the court in which the judge is to sit and the duration of the assignment. While so assigned, the judge shall possess all of the power and authority of a judge of a court to which the judge is assigned.

The Maryland Court of Appeals has reviewed the constitutionality of Rule 16-108 (and its predecessor, Former Maryland Rule 1202(b)(1), which was recodified with minor amendments,

2

*see Murphy v. Liberty Mut. Ins. Co.*, 478 Md. 333, 381 n.54 (2022)). The cases uphold reassignments made by either the Chief Judge or the Circuit Administrative Judge. *E.g.*, *Strickland v. State*, 407 Md. 344 (2009) (upholding re-assignment by the Circuit Administrative Judge of a motion for modification of sentence from one circuit judge to another circuit judge); *Whitaker v. Prince George's County*, 307 Md. 368 (1986) (upholding assignment by the Circuit Administrative Judge of cases pending in the Circuit Court for Prince George's County to a judge in the Circuit Court for Calvert County); *Baltimore Radio Show v. State*, 193 Md. 300 (1949) (upholding Chief Judge's assignment of an Associate Judge of the Seventh Judicial Circuit to sit as a Judge of the Criminal Court of Baltimore City and issue a citation for constructive contempt). Collectively, these cases highlight the "broad administrative authority" granted by the state Constitution to the Chief Judge to manage the courts. *E.g.*, *Strickland*, 407 Md. at 357 ("Rule 16-101 reiterates the broad administrative authority of the Chief Judge of the Court of Appeals"). "Whether it be by the Court of Appeals directly or the circuit administrative judge as its alter ego in the circuit, this power and authority encompasses all facets of the internal management of our courts." *Whitaker*, 307 Md. at 376. The Court's broad authority is also recognized in statute. *Murphy*, 478 Md. at 381 (citing CJ § 1-201(a) (providing that the Court's power to issue rules and regulations concerning practice and procedure and judicial administration in the courts is to be "liberally construed")).

> The July 1, 2019 Designation Order by Chief Judge Barbera reads:
>
> Under and by virtue of the authority contained in Section 18(b) of Article IV of the Constitution of Maryland and pursuant to Maryland Rule 16-102, I do hereby designate . . . the Honorable Paul J. Hanley, . . . , Associate Judges of the Third Judicial Circuit of Maryland (Baltimore County), to sit, either alone or with one or more other Judges, as Judges of the District Court of Maryland - District 8 (Baltimore County), for the period from July 1, 2019 through June 30, 2020, inclusive . . . .

ECF 39-3.

Chief Judge Barbera therefore did not violate the State Constitution or the Maryland Rules when she assigned Judge Paul Hanley, a Circuit Court Judge, to sit temporarily as a District Court Judge. And once an assignment is made, the assigned judge "shall possess all of the power and authority of a judge of a court to which the judge is assigned." Md. Rule 16-108(b). Therefore, Judge Hanley possessed the same authority as a district court judge at the time he issued the search warrant.[1]

Turning to the geographical argument, under the Maryland Constitution, the jurisdiction of the District Court of Maryland is unified, meaning that each district judge's jurisdiction is statewide. *Birchead v. State*, 317 Md. 691, 699 (1989) (holding that district court judges may issue a search warrant for execution in any other county of the State); *cf. Gattus v. State*, 204 Md. 589, 595 (1954) (holding that the power of circuit court judges to issue search warrants is limited to the county in which they sit). Thus, Judge Hanley, through his assignment as a district court judge, could properly issue a search warrant for the residence in Baltimore City despite his assignment to the Baltimore County courts.

Finally, even if Chief Judge Barbera's Order had been deemed unconstitutional and the search warrant invalid, the good faith exception would apply. *United States v. Leon*, 468 U.S. 897, 920 (1984); *see, e.g.*, *Handy v. United States*, No. 10-CV-3437, 2012 WL 6617326, at *6 (D. Md.

---

[1] Mr. Poynter also asserts that the Order unconstitutionally designated the circuit court judges to sit simultaneously as circuit court and district court judges. From the facts, it is unclear how Judge Hanley was sitting simultaneously as both a Circuit Court Judge and District Court Judge. At best, Judge Hanley signed the search warrant as a circuit court judge, but executed it using his district judge powers. This could be viewed more as a clerical error on part of the judge rather than a simultaneous act of powers. Even if this simultaneous use of judicial powers can be established, Maryland case law emphasizes the "broad administrative authority" conferred by the state constitution to the Court of Appeals and the Chief Judge to manage the courts and judges. Given that precedent, it is unlikely that the Court of Appeals would consider this assignment a violation of the state constitution.

Dec. 18, 2012) (holding that the good faith exception applies when a circuit judge in Baltimore City executes a warrant for Baltimore County beyond the judge's jurisdiction). The goal of the exclusionary rule is to deter police misconduct. *United States v. Peltier*, 422 U.S. 531, 542 (1975). The rule does not apply when an officer acts in good faith and there is no misconduct to deter. *Leon*, 468 U.S. at 920. These principles allow the officer some degree of deference to enacted legal authorities. *Illinois v. Krull*, 480 U.S. 340, 349–50 (1987) ("Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law"). As the analysis above demonstrates, Chief Judge Barbera's Order appears to be fully constitutional and is not "clearly unconstitutional" in a way that might trigger an officer's duty to question it. Moreover, Detective Feeley testified that he decided to present the warrant to Judge Hanley because the States' Attorney's Office directed him to do so. It would be unreasonable to expect a police officer to be so well-versed in the intricacies of the Maryland constitution that he should question the prosecutor's instructions about which duty judge to approach. Thus, Detective Feeley and the law enforcement officers who executed the warrant acted in good faith in relying on Judge Hanley's authority to issue the search warrant he signed. Mr. Poynter's motion to suppress the property seized in that search will therefore be denied.

II.     **Motion to Suppress Statements**

Following Mr. Poynter's arrest on December 20, 2019, he was transported to Baltimore County Police Department's Headquarters to be processed and interviewed. A video of Mr. Poynter's detention and interview was provided to the Court in camera and relevant excerpts were played during the motions hearing. *See* Ex. 3. The interviewing detective, Detective Feeley, also testified at the hearing. Mr. Poynter raises several arguments to suggest that his statements were involuntary: (1) that his statements were involuntary because he had been physically

assaulted by one or more officers; (2) that he had invoked his right to counsel and had not re-initiated conversation with the officers; and (3) that he never formally waived his *Miranda* rights because the waiver question on the form was not read to him.

Beginning with the assault, the Fifth Amendment's prohibition on self-incrimination requires that a confession be voluntary. *Bram v. United States*, 168 U.S. 532, 542 (1897); *Oregon v. Elstad*, 470 U.S. 298, 304–05 (1985). While there is "no talismanic definition of 'voluntariness,'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973), courts consider:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Id.* at 225–26. In determining whether a defendant's will was overborne in a particular case, courts assess the totality of circumstances, including factors like "the length of detention," "the repeated and prolonged nature of the questioning," and "the use of physical punishment such as the deprivation of food or sleep" to assess "the psychological impact on the accused." *Id.* at 226 (internal citations omitted). As the Fourth Circuit has explained, "[t]he ultimate question is whether the pressure, in whatever form, was sufficient to cause the petitioner's will to be overborne and his capacity for self-determination to be critically impaired." *Ferguson v. Boyd*, 566 F.2d 873, 877 (4th Cir. 1977).

The use of physical violence to coerce or extort a confession is universally rejected by the courts. *See Brown v. Mississippi*, 297 U.S. 278 (1936) (holding that a criminal conviction based upon a confession obtained by brutality and violence was constitutionally invalid under the Due Process Clause of the Fourteenth Amendment); *see also Stein v. New York*, 346 U.S. 156, 182 (1953), overruled on other grounds by *Jackson v. Denno*, 378 U.S. 368 (1964) ("Physical violence or threat of it by the custodian of a prisoner during detention serves no lawful purpose, invalidates

6

confessions that otherwise would be convincing, and is universally condemned by the law.  When present, there is no need to weigh or measure its effects on the will of the individual victim."). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997).

Here, the officers did not employ physical violence to coerce Mr. Poynter to talk.  The officers treated Mr. Poynter in an entirely non-confrontational manner until he began to engage in aggressive behavior by throwing a chair and resisting restraint of his left hand.  The ensuing physical altercation in an effort to restore order does not automatically render Mr. Poynter's confession inadmissible. *Braxton*, 112 F.3d at 780.  The question is whether the physical violence in fact "cause[d] [Mr. Poynter's] will to be overborne." *Ferguson*, 566 F.2d at 877.  It is clear from the video that Mr. Poynter was already asking to talk to officers prior to the altercation.  Ex. 3 at 12:26:05 (asking one of the officers when someone will come in to talk to him); 12:51:26 (asking a detective the same); 12:54:23 (asking a new officer whether he is the one he is supposed to talk to); 12:55:21 (demanding the lead officer come to talk to him).  After the altercation, Mr. Poynter (1) was left alone for several minutes to "cool down," (2) was afforded the opportunity to leave the room with medical personnel to obtain further treatment, without talking to the officers, and (3) had further opportunity to consider his options about whether to provide information to the detectives, *see* Ex. 3 at 1:40:26 ("If I were to say that I don't want to talk, would I be arrested, that is the question I want to ask.").  Thus, it is clear that the isolated incident of physical violence did not cause Mr. Poynter's will to be overborne or render his subsequent statements involuntary.

The next question is whether Mr. Poynter's right to counsel was violated when he was interrogated without counsel present.  "If the individual states that he wants an attorney, the

7

interrogation must cease until an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). Once invoked, however, the right to counsel can be waived, though waiver is the Government's burden to prove. *Id.* at 475. Waiver "cannot be established by showing only that [a defendant] responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). Instead, waiver occurs only where "the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85. "But even if a [subsequent] conversation [] is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983). Any waiver must be voluntary and knowing, based on the totality of the evidence. *Edwards*, 451 U.S. at 482 ("It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'").

Here, Mr. Poynter unambiguously requested counsel. *See* Ex. 3 at 12:24:00 ("I want a lawyer, that's what I want, I want a lawyer. C'mon, either arrest me or take me to jail, whatever you want to do, I want a lawyer."). The question, then, is whether he subsequently voluntarily and knowingly "initiate[d] further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 482, 484–85.

The question of "initiation" is complicated here by the following interaction between Mr. Poynter and one of the detectives:

   Mr. Poynter:  Well where's the [lead detective] at?

8

| | | |
|---|---|---|
| Detective: | | He's on the floor, he'll be with you when he gets a chance. |
| Mr. Poynter: | | I'm being locked up, so can I be straight taken down to bookings? |
| Detective: | | Well not right now, he wants to talk to you for a second and explain to you what's going on, don't you want to hear what's going on? |
| Mr. Poynter: | | I want him here now, man. |
| Detective: | | Well, that's tough, you don't have that choice right now . . . yeah, yeah, you're under arrest, it's not a problem. |
| Mr. Poynter: | | Well, take me down to bookings, why am I not in bookings, why am I in here? |
| Detective: | | Because we have to go through some procedures first. |
| Mr. Poynter: | | Well, what if I don't want to talk. |
| Detective: | | You've got to tell it to the officer, the detective, that's all. |

Ex. 3 at 12:55:21. The detective expressly told Mr. Poynter that he had to talk to the lead detective before he could leave the interrogation room and go to Central Booking. With this understanding, Mr. Poynter's continued requests "to talk to" to the lead detective could be interpreted as attempting to terminate the interrogation and proceed through the booking process, not a desire to waive his invoked right to counsel. *See, e.g.*, Ex. 3 at 12:26:05 (asking one of the officers when someone will come in to talk to him); 12:51:26 (asking a detective the same); 12:54:23 (asking a new officer whether he is the one he is supposed to talk to); 12:55:21 (demanding the lead officer come to talk to him); 1:01:51 (following the altercation, saying "I am ready to talk so we can get this over with. … they gotta talk to me."). If interrogation had begun at this point in the exchange, the presumption against waiver likely would have warranted suppression of Mr. Poynter's statements, in light of his plausible alternative motive to be freed from the confines of the interrogation room.

9

A critical intervening circumstance, however, demonstrated Mr. Poynter's genuine desire to reinitiate case-related conversations with the officers, despite not having counsel on site. *Cf. United States v. Ventura*, No. 10-CR-0770, 2013 WL 1455278, at *15 (D. Md. Apr. 8, 2013) (accused waived his invoked right to counsel "through his repeated assertions that he wanted to talk to the detectives immediately"). At Mr. Poynter's request, officers called emergency medical technicians ("EMTs") to the interrogation room to evaluate whether Mr. Poynter had been injured during the altercation. The EMTs told Mr. Poynter they would transport him to the hospital for further evaluation. Instead, Mr. Poynter asked the detective in the room, "What this is all about?" and expressed his desire to talk to the lead detective. *See* Ex. 3 at 1:28–1:31. He then refused transport with the EMTs. When they asked why, Mr. Poynter responded, "I want to get out, I really want to go [to the hospital], but I want to talk to the detective first." *Id.* at 1:34:36. At that point, it is clear that Mr. Poynter wished to engage with the detective about the case, at least to glean information from him. Mr. Poynter's alternate potential motivation, simply trying to "check the box" of meeting with the detective in order to leave the room, no longer applied because the EMTs were willing to remove Mr. Poynter from the premises before any such meeting. Thus, during the exchange with the EMTs, Mr. Poynter unequivocally reinitiated voluntary contact with the officers, without the presence of his attorney.

Finally, Mr. Poynter's contention that he could not have waived his *Miranda* rights because he was never expressly asked to waive them lacks merit. "To effectuate a waiver of one's *Miranda* rights, a suspect need not utter any particular words." *United States v. Umana,* 750 F.3d 320, 344 (4th Cir. 2014) (quoting *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir.2000)) (internal quotation marks omitted). In fact, "[a] suspect impliedly waives his *Miranda* rights when he acknowledges that he understands the *Miranda* warning and then subsequently is willing to answer questions."

*Id.* (citing *United States v. Frankson*, 83 F.3d 79, 82 (4th Cir. 1996)).  Put another way, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

The video evidence in this case reflects that precise situation.  The detective advised Mr. Poynter of each of his *Miranda* rights, and Mr. Poynter responded that he understood each right.  His follow up question to the officer demonstrates his understanding that he did not have to speak with the officers.  *See* Ex. 3 at 1:40:26 ("If I were to say that I don't want to talk, would I be arrested, that is the question I want to ask.").  During the exchange, then, Mr. Poynter proceeded to make uncoerced statements to the officers.  In light of the evidence of his valid *Miranda* waiver, those statements are properly admissible at his trial.

### III. Conclusion

For the reasons stated herein, Mr. Poynter's motions, ECF 32 and 33, are DENIED.  A separate order accompanies this Memorandum Opinion.


Dated:  September 13, 2022                                          /s/
                                                            Stephanie A. Gallagher
                                                            United States District Judge